UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN THE MATTER OF AN APPLICATION ) | M.J. No.  13-CR-10289-DPW |
| OF THE UNITED STATES FOR ) | |
| AN ORDER AUTHORIZING THE USE ) | |
| OF A PEN REGISTER AND TRAP AND ) | AFFIRMATION IN SUPPORT OF |
| TRACE WITH CALLER ) | APPLICATION |
| IDENTIFICATION DEVICE AND CELL ) | |
| SITE LOCATION AUTHORITY ) | **FILED UNDER SEAL** |
| AUTHORIZATION TO OBTAIN ) | |
| LOCATION DATA CONCERNING A ) | |
| CELLCO PARTERSHIP DBA VERIZON ) | RECEIVED IN OFFICE OF |
| WIRELESS CELLULAR PHONE ) | ROBERT B. COLLINGS |
| ASSIGNED CALL NUMBER: ) | U.S. MAGISTRATE JUDGE |
| **(415) 243-6683**, AND BEARING ESN | |
| A0000031B879BA | OCT 2  2013 |

UNITED STATES DISTRICT COURT
BOSTON, MASSACHUSETTS

I, Phillip Lavoie, being duly sworn, depose and state as follows

1.      I am Special Agent with the Department of Homeland Security ("DHS"),

Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI") and

am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure

41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly

authorized by the Attorney General to request a search warrant.

2.      I have been employed with the DHS since approximately June 2006.  From June

2006 until April 2007, I was a Border Patrol Agent in San Diego California.  I became a Special

with ICE in April 2007. I am currently assigned to the Organized Crime Drug Enforcement

Task Force ("OCDETF") Boston Strike Force, a task force of federal, state and local law

enforcement officers including law enforcement agents from HSI, the U.S. Drug Enforcement

Administration ("DEA"), the Federal Bureau of Investigations ("FBI"), and the U.S. Marshal's

Service ("USMS"). Since becoming a Special Agent with HSI, I have conducted numerous

investigations of unlawful drug distribution and importation, in violation of 21 U.S.C. §§ 841(a)(1), 843(b), 846, 952, 960 and 963; investigations involving the laundering of drug proceeds, in violation of 18 U.S.C. §§1956 and 1957; and have conducted and participated in wiretaps; physical surveillance; surveillance of undercover transactions; the introduction of undercover agents; the execution of search warrants; debriefings of informants and witnesses; and reviewed recorded conversations, telephone, financial and drug records. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed and the methods of payment for such drugs. Through my training, education and experience, I have become familiar with the manner in which the proceeds of drug trafficking are laundered both domestically and internationally.

3.     I am submitting this affidavit in support of an application for an order authorizing the use of a pen register with caller identification, trap and trace device and cell-site location authority (hereinafter "cell-site location authority") on a prepaid Cellco Partnership DBA Verizon Wireless Phone Number **(415) 243-6683**, bearing ESN A0000031B879BA, with no further identifying subscriber information available, which is being used by JOSEPH CIMINO (hereinafter "the Target Telephone").    Specifically, I am submitting this affidavit in support of an application for an order for a period of sixty (60) days from the date of this order: (a) pursuant to 18 U.S.C. §§ 3121-26, authorizing the use of a pen register with a caller identification and/or trap and trace device, without geographic limitation, in connection with a federal fugitive investigation being conducted by Homeland Security Investigations ("HSI"), the U.S. Drug Enforcement Administration ("DEA"), and the U.S. Marshal's Service ("USMS") targeting JOSEPH CIMINO, a federal fugitive; (b) pursuant to 18 U.S.C. §§ 2703 (c-d) authorizing the pen register and trap and trace device to capture and report at the same time originating and terminating

cell-site location information, specifically, information that identifies the antenna tower receiving transmissions from the Target Telephone and information, if available, on what portion of that tower is receiving a transmission at the beginning and end of a particular telephone call made from or received by the Target Telephone, which information is to be transmitted from Cellco Partnership DBA Verizon Wireless to the HSI, the DEA, and the USMS for all telephone calls made to or from the Target Telephone ("cell-site location information"); (c) pursuant to 18 U.S.C. §§ 2703 (c-d), authorizing the disclosure of subscriber and call detail and billing information related to other telephone numbers billed to the subscriber for the Target Telephone and subscriber information related to telephone numbers that are in contact with the Target Telephone; and (d) directing Cellco Partnership DBA Verizon Wireless to furnish to HSI, DEA, and the USMS all information, facilities, and technical assistance, as the service provider may have available, necessary to operate a pen register with a caller identification device and/or trap and trace device and cell site location authority on the Target Telephone subject to the limitations of 18 U.S.C. § 3121(c)(The information described above is hereinafter referred to collectively as, "the Requested Information").

4.      I am also submitting this affidavit in support of an application in support of an application for an order pursuant to Fed. R. Crim. P. 41 and 18 U.S.C. § 2703(c)(1)(A), authorizing agents of the HSI, DEA and the USMS to ascertain the physical location including but not limited to E-911 Phase II data (or other precise location information)(hereinafter, "Precise Location Information"),[1] for a period of thirty (30) days for the above described Target Telephone.

_____

[1] Such information shall, where other information is unavailable, include records reflecting the tower and antenna face ("cell site") used by the Target Telephone at the start and end of any call.

5.      Probable cause exists to believe that the Requested Information and Precise Location Information will constitute or lead to evidence regarding the location and apprehension of a federal fugitive for which there is an arrest warrant outstanding in the District of Massachusetts.

6.      I base this affidavit on: (a) my personal knowledge and involvement in this investigation; (b) information provided to me other investigators from HSI, the DEA, and the USMS; and (c) my experience and training as a criminal investigator. This affidavit includes only those facts that I believe are necessary to support the application for an Order authorizing the useof a pen register with caller identification, trap and trace device and cell site location authority and precise location information and does not include all of the facts uncovered during the investigation.

## FACTS AND CIRCUMSTANCES

### A.      Overview of Investigation

7.      Beginning in 2011, HSI agents began receiving information from a confidential source of information (hereinafter "CI-1") about the drug trafficking and money laundering activities of a criminal organization in Canada. CI-1 began cooperating in 2011, following CI-1's arrest on federal drug trafficking charges, and cooperated in hopes of obtaining leniency at sentencing. As further described below, the information that CI-1 provided has been proven reliable and has been corroborated by independent evidence including recorded phone calls and undercover money laundering transactions.

8.      As part of the investigation, at the control and direction of law enforcement agents, CI-1, informed members of a criminal organization in Canada that CI-1 had the ability to transfer large quantities of drug money in the Massachusetts and New England areas (the proceeds of

marijuana trafficking) to California (for the purchase of cocaine). The targets of the investigation then provided CI-1 with a Blackberry device with PGP encryption to coordinate the transportation and laundering of drug proceeds in Massachusetts. At the direction and control of law enforcement agents, CI-1 then provided this encrypted Blackberry device to law enforcement agents who acted in an undercover capacity as illicit drug money couriers and money launders.

**B.** **Undercover Money Laundering Transactions Between Massachusetts and California.**

9.       Beginning in April 2012 and continuing until December 2012, undercover law enforcement agents ("UC agents") coordinated with the members of the organization in Canada to pick-up large quantities of drug money in Massachusetts and, in return for a percentage commission, transport and transfer that drug money to Southern California. As further described below, the recipient of this drug money in California was later identified as JOSEPH CIMINO, the user of the Target Telephone.

   *1.       April 12, 2012 Pick-Up of $122,060 from ISSAM ELNARDDAFF in Massachusetts, and April 18, 2012 Delivery of $112,060 to JOSEPH CIMINO in California.*

10.      The first undercover money laundering transaction took place on April 12, 2012. Prior to the transaction, the UC agent ("UC-1") received instructions over the encrypted Blackberry to call an individual referred to as "Jack" at phone number (917) 704-5546 for the purpose of picking approximately $115,000 in U.S. currency. UC-1 called "Jack" and arranged to meet "Jack" in Watertown, Massachusetts.[2] However, when UC-1 called "Jack" to finalize the transaction, another male answered the phone who said he was "Jack's" cousin. This second male was later identified as ISSAM ELNARDDAFF. During the call, ELNARDDAFF told UC-

---

[2] Unless otherwise indicated, each of the undercover phone calls and meetings described herein were recorded.

1 that everything was ok, and that he (ELNARDDAFF) would be there to "drop off his taxes" (the money) instead of "Jack."

11.     That same day, at around 3:10 p.m., UC-1 positioned himself at the entrance of the Arsenal Mall in Watertown, Massachusetts, while other agents set up surveillance. At 3:20 p.m., UC-1 received an incoming call from "Jack's cousin" (ELNARDDAFF). During the call, ELNARDDAFF said he was on his way and would be driving a silver/grey Nissan Sentra. A short time later, a male later identified as ISSAM ELNARDDAFF approached UC-1 in the parking lot, engaged UC-1 in brief conversation, and immediately walked toward a Nissan Sentra, bearing MA registration 939DD1, registered to Issam Elnarddaff, 18 Bates Avenue, #1, Quincy, MA. ELNARDDAFF got into the Nissan Sentra, pulled up directly next to UC-1's vehicle, and got out of the Sentra. ELNARDDAFF opened the trunk to the Sentra, retrieved a box, and placed the box into the back seat of UC-1's vehicle. The box was well taped and had the markings of sink/facet hardware. ELNARDAFF then got into his vehicle and immediately drove away. The box was later found to contain $112,060 in U.S. currency.

12.     On April 16, 2012, CI-1 provided HSI Special Agent Michael Krol with instructions that the targets in Canada had given to CI-1 for delivery of the money in California, a total of $106,460 ($112,060 minus a commission of $5,600). Thereafter, UC-1 received a call from a male who referred to himself as "Bobby," the intended recipient of the drug proceeds, who was calling from phone number (209) 628-7636.  On April 17 and 18, 2012, UC-1 placed numerous recorded telephone calls to "Bobby" at this phone number.  During the calls, "Bobby" agreed to meet with UC-1 agent in the Los Angeles area on April 18, 2012 at approximately 12:00 p.m.

13.     On April 18, 2012, at approximately 12:55 p.m., law enforcement agents established surveillance in the area of a Target store located at 950 East 33rd Street, Signal Hill,

California.  UC-1 had several calls with "Bobby" at (209) 628-7636.  At around 1:15 p.m., a gray Nissan Sentra, bearing CA Reg. 6R1B264 (a Budget Car Rental, rented by JOSEPH CIMINO of Boston, Massachusetts) arrived in the parking lot of the Target and parked next to UC-1's vehicle. A short time later, UC-1 exited his vehicle with a shoulder bag containing a brown paper shopping bag, further containing $106,460 in U.S. currency ($112,060 minus a "commission" of $5,600). UC-1 walked toward and got into the rear of the Nissan Sentra which was occupied by two white males, Michael Cimino and JOSEPH CIMINO. After a brief conversation, UC-1 placed the bag containing the $106,460 in the Nissan and seconds later the Nissan departed the area.

> 2.     *April 28, 2012 Pick-up of $233,560 from CHRISTOPHER STANIFORTH in Massachusetts and May 1, 2012 Delivery of $219,440 to JOSEPH CIMINO in California.*

14.     During the week of April 23, 2012, CI-1 informed Special Agent that the members of the organization in Canada needed an additional amount of drug money picked-up in the Boston area on April 28, 2012, that would be delivered to Boston from Vermont by male referred to as "Donald." On April 28, 2012, while acting in an undercover capacity, SA Krol received an incoming call from a male who referred to himself as "Donald" (who was later identified as CHRISTOPHER STANIFORTH)[3] who was calling from phone number (802) 274-2591. During the call, STAINFORTH arranged to deliver approximately $233,000 in U.S. currency to UC agents. Thereafter, another undercover agent ("UC-2"), placed several recorded phone calls to "Donald" at phone number (802) 274-2591. During these calls, some of which were not recorded,

---

[3]On November 15, 2012, an indictment was returned in the District of Vermont that charges STANIFORTH with conspiracy to distribute marijuana in criminal case number 12-cr-00148-wks.  On June 6, 2013, a superseding indictment was returned that charges STANIFORTH with money laundering as well.  STANIFORTH is currently a fugitive on that case.

STAINFORTH agreed to meet with UC-2 in the area of Seaport Boulevard in South Boston at around 2:00 p.m.

15.     At around 2:50 p.m. on April 28, 2012, UC-2 met with STANIFORTH in front of the Atlantic Beer Garden restaurant in South Boston. UC-2 and STAINFORTH walked together to STAINFORTH's vehicle, a grey Subaru Impreza, bearing VT registration ETF-757, which was parked in a nearby parking lot.  STANIFORTH handed UC-2 a blue weighted duffel bag. STANIFORTH asked UC-2 if "the bag was OK?" and said he had been up all night counting the money and was sure it (the count) was right. UC-2 told STANIFORTH to keep his phone on for three hours and, if all was good, he would hear nothing. STANIFORTH said that the South Boston location was good for any further transactions because it was close to the highway. The duffel bag was later determined to contain a total of $233,560 in U.S. Currency.

16.     On April 29, 2012, CI-1 provided SA Krol with the name and phone number for the delivery in California, phone number (323) 806-8317 and a code of "Bobby who is Peter." On April 30 and May 1, 2012, UC-2 placed recorded telephone calls to "Bobby" at telephone number (323) 806-8317.  During these calls, "Bobby" provided the correct code, and UC-1 and "Bobby" arranged to meet in Los Angeles at around 2:00 p.m. on May 1, 2012 to complete the transaction. "Peter" was later determined to be JOSEPH CIMINO.

17.     On May 1, 2012, at around 2:10 p.m., UC-2 arranged to meet with "Peter" in the parking lot of a Target store located at 950 East 33rd Street in Signal Hill, California. At 2:33 p.m., UC-2 received a call from "Peter" who informed UC-2 that he had just entered the parking lot and was driving a silver SUV. Moments later, UC-2 spotted a sliver SUV with Arizona license plates pull up to UC-2's location. UC-2 got out of UC-2's vehicle and engaged in brief

conversation with the driver of the silver SUV, JOSEPH CIMINO.   UC-2 gave CIMINO a black colored carry-on suitcase containing a total of $219,440 in U.S. currency ($233,560 minus a commission of $14,120).   During the transaction, CIMINO also expressed concerns about law enforcement watching the area, and told UC-2 that he observed what he believed to be plainclothes police officers conducting surveillance. At the conclusion of the brief meeting, CIMINO told UC-2 to leave the cell phone on for an hour, CIMINO and UC-2 exchanged good-byes, and CIMINO departed the area in the silver SUV with the money.

> 3.   *August 7, 2012 Pick-up of $254,000 from MANUEL SANCHEZ-DeJESUS in Massachusetts and August 9, 2012 Delivery of $241,770 to JOSEPH CIMINO in California.*

18.   On August 7, 2012, following instructions from the organization in Canada to CI-1, law enforcement agents conducted another pick-up of drug proceeds in Massachusetts. Before the UC pick-up, CI-1 informed SA Krol that an individual using the name of "Mark" had possession of the money that the phone number that "Mark" was using phone number (339) 235-4547.

19.   On August 7, 2012, at around 12:00 p.m., a third undercover law enforcement ("UC-3") placed a recorded call to phone number (339) 235-4547 and spoke to a male with a Middle Eastern accent who identified himself as "Mark." During the call, in a coded manner, "Mark" told UC-3 that he was not going to see the "girl" (the person who had the money) until 3:00 p.m., and told UC-3 to call back after 3:00 p.m.   At 4:12 p.m., UC-3 received an incoming call from "Mark." During the call, "Mark" told UC-3 to head in the direction of the American Legion Highway in Roslindale. UC-3 then told "Mark" that the location he chose was not convenient due to the traffic and suggested the South Bay Mall as a halfway point. Mark replied that he did not know that location told UC-3 that he would call back.

20.     Minutes later at 4:19 p.m., UC-3 received two calls from another phone number, (339) 235-4271.   UC-3 answered each of the calls, but could not hear a voice on the other end of the call. At 4:21 p.m., UC-3 placed outgoing calls to this new phone number, (339) 235-4271, and a male whose voice UC-3 recognized as "Mark" answered the phone. During the call, "Mark" told UC-3 that he wanted UC-3 to drive to a McDonalds on American Legion Highway in Roslindale because this was the location he had agreed upon with "his people." Mark told UC-3 that upon arriving at the McDonalds, "they" would take his car for a period of time before returning it (in order to transfer the money). UC-3 disagreed with this scenario, and told "Mark" that he needed to talk to his (Mark's) people.   "Mark" agreed and said he would call back. At 4:39 p.m.,UC-3 received an incoming call from "Mark." Mark asked UC-3 to send him an address of where to meet, and told UC-3 that he would send his guy to meet UC-3. Mark asked UC-3 to please pick a good spot to meet. UC-3 said it would be in a large parking lot. Both agreed and the conversation ended.   At 4:44 p.m., UC-3 sent "Mark" a text message that read, *"8 Allstate Road, Dorchester, MA"* as the meet location. At 4:54 p.m., UC-3 received an incoming call from "Mark." "Mark" said he received the text message, and asked UC-3 about the time they would meet. UC-3 told "Mark" in about a half hour. "Mark" said fine and told UC-3 to take it easy on the guy because his English was not too good. UC-3 then suggested that the meet at Home Depot. Mark disagreed stating there's a lot of "P's" (police) in the area. UC-3 suggested the hotel next door and asked Mark to call when his guy is in the area. Mark agreed and the call was ended.

21.     At 5:10 p.m., UC-3 received an incoming text message from "Mark" that read, *"His chargin his phone 20 min gona leave home."* At around 5:20 p.m., UC-3 arrived in the parking lot of the South Bay Mall in Dorchester, Massachusetts and parked behind the

Applebee's restaurant and directly in-front of a Star Market. At 5:51 p.m., UC-3 received an incoming text from "Mark" that read, *"He just left the house gona be there in 20 min."*

22. At 6:08 p.m., UC-3 received an incoming call from a Hispanic male who was calling from phone number (339) 364-9278. As further described below, this male was later identified as Manuel Sanchez-DeJesus. Sanchez told UC-3 that he would be there in 15 minutes. UC-3 asked Sanchez to give UC-3 a call when he got into the parking lot. At 6:21 p.m., UC-3 received an incoming call from Sanchez who was again calling from phone number (339) 364-9278. Sanchez said he was by the Garden Center (at the Home Depot) and UC-3 gave Sanchez directions to UC-3's location. Then during a call at 6:26 p.m., UC-3 gave Sanchez additional directions to meet, in front of the Stop & Shop, to an unidentified female because Sanchez had a hard time understanding English.

23. A short time later, at approximately 6:28 p.m., while UC-3 was still on the phone with Sanchez and the female, UC-3 observed a green Subaru Legacy station wagon bearing MA registration 67WP05, registered to Guadalupe Vides, 733 American Legion Highway, Roslindale, Massachusetts, pull-up in front of UC-3 operated by a Hispanic male (Sanchez) with an Hispanic female passenger who was on the phone seated in the front passenger's seat. Sanchez parked the Subaru next to UC-3's vehicle, got out of the car, and met with UC-3 in the parking lot. UC-3 walked with Sanchez to the rear hatch of the Subaru. Sanchez opened the rear hatch, retrieved a black Nike gym duffle bag from the trunk, handed the bag to UC-3, and shut the rear hatch. Without any conversation, UC-3 took the black duffle bag and placed the black duffle bag onto the rear seat of UC-3's undercover vehicle. A short time later, at approximately 6:30 p.m., UC-3 then left the area with the black duffle bag. The black duffle bag was later found to contain a total of $254,000 in U.S. currency.

24.     Following this delivery of money, CI-1 and UC agents received instructions from the organization in Canada regarding the delivery of the drug money in California. Specifically, CI-1 and UC agents received instructions to call "Tony" at phone number (323) 774-4743 to make arrangements to deliver the money to "Tony" in California.

25.     On August 9, 2012, at 9:38 a.m., UC-3 placed a call to phone number (323) 774-4743. A male, later identified JOSEPH CIMINO, answered the phone and indicated that he was "Tony." UC-3 suggested that they meet at Hacienda Hotel in El Segundo, California. "Tony" replied, "Alright perfect." At 10:03 a.m., while UC-3 was seated in the patio area of the Hacienda Hotel, UC-3 received an incoming call from "Tony." "Tony" told UC-3, "I'm across the street I'll just come inside [if] that's cool." Within seconds of hanging up, UC-3 observed a male who UC-3 recognized from previous photos as JOSEPH CIMINO. UC-3 stood up, shook CIMINO'S hand, and the two hugged. CIMINO sat down to the right of UC-3 in a chair next to the black bag that contained a total of $241,770 in U.S. Currency ($254,000 minus a commission of $12,230). CIMINO asked UC-3, "How things are going?" UC-3 stated things are "good." UC-3 told CIMINO, "all set" and pointed to the bag. CIMINO said thank you, took hold of the bag, placed it over his shoulder, and exited the hotel. Upon leaving the hotel, agents observed CIMINO walk down the street with the bag and get into a vehicle and depart the area.

26.     On September 26, 2013, a grand jury in the District of Massachusetts returned an indictment in criminal case 13-10289 DPW charging CIMINO and three others with conspiracy to launder monetary instruments.  The indictment and the case are currently under seal.  The same day, a warrant was issued for CIMINO's arrest on the indictment which is still valid and executable.  CIMINO is believed to be residing in Santa Monica, California but frequently travel to and has family in Massachusetts.

**C.     Identification of the Target Telephone.**

27.     As further described above, on May 1, 2012, a UC agent delivered a total of $219,440 in drug proceeds to JOSEPH CIMINO in California. During the transaction, CIMINO informed the UC agent, UC-2, that he was concerned about the presence of law enforcement officers in the area who may be conducting surveillance. At the time of the transaction, CIMINO was driving a rental vehicle, an SUV with Arizona license plates, a silver Chevrolet bearing Arizona registration 614ZTL.   According to rental car records, CIMINO rented the vehicle. In the rental application for the vehicle, CIMINO provided a phone number of (617) 901-9119. Agents obtained records for this phone number which revealed that shortly after the delivery of drug money on May 1, 2012, CIMINO discontinued using this phone number.

28.     Thereafter, in August 2012, investigators analyzed the phone numbers of several of CIMINO's associates and family members with which CIMINO had previously been in consistent telephone contact. From analysis of these phone records, agents identified as new phone number, Cellco Partnership DBA Verizon Wireless Cellular phone number (415) 243-6883 that was activated on May 12, 2012 (the Target Telephone).   On November 9, 2012, U.S. Magistrate Judge Marianne B. Bowler signed an order authorizing the installation and use of a pen register with caller identification, trap and trace device and cell site location authority for the Target Telephone for a period of sixty days.   The cell-site location data from this order revealed that the Target Telephone was primarily located in the Santa Monica, California area, but also traveled to Massachusetts.

29.     More recent phone records demonstrate that Target Telephone is currently active, and is being used by either CIMINO, or someone closely associated with CIMINO.   In particular, based on phone records between August 2013 and September 2013, the Target Telephone is in

frequent contact with several members of CIMINO's immediate family including his father (Joseph Cimino), sister (Nicole Cimino), and brother (Michael Cimino).  For example, between August 5, 2013 and August 25, 2013, there were 58 contacts (both phone calls and text messages) between the Target Telephone and phone number (857) 540-0794 which is subscribed to Michael Cimino (believed to be JOSEPH CIMINO's brother).  Between August 5, 2013, and August 13, 2013, there were 30 contacts between the Target Telephone and phone number (617) 283-2082, which is subscribed to (and believed to be used by) JOSEPH CIMINO Sr., CIMINO's father. Between August 16, 2013 and September 2, 2013, there were 17 contacts between the Target Telephone and phone number (310) 528-1915, which is subscribed by and believed to be used by Nicole Cimino, CIMINO's sister.

30.     Based on the foregoing, agents believe that either CIMINO or someone closely associated with CIMINO has possession of and is using the Target Telephone.  Therefore, obtaining cell site location authority and the Requested Information will assist HSI, the DEA, and the USMS in locating the geographic area in which CIMINO or someone else closely associated with CIMINO is located.  Such information is likely to lead to the location and apprehension of CIMINO in this fugitive investigation and will enable investigators to conduct physical surveillance in areas in which CIMINO is likely to travel.  In addition, subscriber information relating to the incoming and outgoing phone calls on the Target Telephone will enable agents to determine the identities and addresses of CIMINO's associates within the cell-site area of the Target Telephone's operation.  By reviewing the information from these call detail records, the agents can identify individuals who may have information about CIMINO's current whereabouts, and will provide important information about individuals to be interviewed or surveilled to locate and arrest CIMINO on the outstanding warrant.

## AUTHORIZATION REQUEST

31.     Based on the foregoing, there is probable cause to believe that the Requested Information and Precise Location Information will constitute or lead to evidence regarding the location of a federal fugitive. The Requested Information and Precise Location Information are necessary to determine the location of the Target Telephone so that so that law enforcement agents can conduct physical surveillance of the user of the Target Telephone in order to locate and apprehend a federal fugitive. Furthermore, there are specific and articulable facts, pursuant to 18 U.S.C. § 2703(c)(1), (c)(2), and (d), that records requested for the Target Telephone is relevant and material to the ongoing investigation.

32.     WHEREFORE, pursuant to 18 U.S.C. §§ 3121-26, it is requested that the Court issue an Order authorizing the use of a pen register with a caller identification and/or trap and trace device, without geographic limitation, for a period of sixty (60) days from the date of this order for the Target Telephone, in connection with a federal fugitive investigation being conducted by Homeland Security Investigations ("HSI"), the U.S. Drug Enforcement Administration ("DEA"), and the U.S. Marshal's Service ("USMS") targeting JOSEPH CIMINO, a federal fugitive.

33.     WHEREFORE, pursuant to 18 U.S.C. §§ 2703(c) and (d), it is requested that the Court issue an Order authorizing the pen register and trap and trace device to capture and report at the same time originating and terminating cell-site location information, specifically, information that identifies the antenna tower receiving transmissions from the Target Telephone and information, if available, on what portion of that tower is receiving a transmission at the beginning and end of a particular telephone call made from or received by the Target Telephone, which information is to be transmitted from Cellco Partnership DBA Verizon Wireless to the

HSI, the DEA, and the USMS for all telephone calls made to or from the Target Telephone ("cell site location information").

34. WHEREFORE, pursuant to 18 U.S.C. §§ 2703 (c) and (d), it is requested that the Court issue an Order authorizing the disclosure of subscriber and call detail and billing information related to other telephone numbers billed to the subscriber for the Target Telephone and subscriber information related to telephone numbers that are in contact with the Target Telephone.

35. WHEREFORE, requested that the Court issue an Order directing Cellco Partnership DBA Verizon Wireless to furnish to HSI, DEA, and the USMS all information, facilities, and technical assistance, as the service provider may have available, necessary to operate a pen register with a caller identification device and/or trap and trace device and cell site location authority on the Target Telephones subject to the limitations of 18 U.S.C. § 3121(c).

36. WHEREFORE, pursuant to Fed. R. Crim. P. 41 and 18 U.S.C. 2703(c)(1)(A), it is requested that the Court issue a warrant and Order authorizing agents of HSI, the DEA, and the USMS to obtain the Requested Information for a period of thirty (30) days.

37. There is "reasonable cause to believe that providing immediate notification of the execution of the warrant may have an adverse result." 18 U.S.C. § 3103a(b)(1). Providing prior notice to the subscriber or users of the Target Telephone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, or flee.

38. The execution of this warrant will not result in the seizure of any tangible property or any wire or electronic communication (as defined in 18 U.S.C. § 2510). To the extent that the warrant authorizes the seizure of any stored wire or electronic information, that seizure is

expressly authorized by 18 U.S.C. § 2703(c)(1)(A).

39.     IT IS FURTHER REQUESTED that the Court direct Cellco Partnership DBA Verizon Wireless to assist HSI, the DEA, and the USMS by providing all information, facilities and technical assistance needed to ascertain the Requested Information, and further direct Cellco Partnership DBA Verizon Wireless, the service providers for the Target Telephone, to initiate a signal to determine the location of the Target Telephone on the service provider's network or with such other reference points as may be reasonably available and at such intervals and times as directed by the law enforcement agent serving the proposed order, and to furnish the technical assistance necessary to accomplish the acquisition unobtrusively and with a minimum of interference with such services as that provider accords the users of the Target Telephone, for a period of thirty (30) days.    Reasonable expenses incurred pursuant to this activity will be processed for payment by HSI, the DEA, and/or USMS.

40.     IT IS FURTHER REQUESTED that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Telephone outside of daytime hours.

41.     IT IS FURTHER REQUESTED that the warrant and this Affirmation, as it reveals an ongoing investigation, be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against flight, and better ensure the safety of agents and others, except that working copies may be served on HSI, the DEA, and the USMS and other investigative and law enforcement officers, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, and Cellco Partnership DBA Verizon Wireless as necessary to effectuate the Court's Order.

42.     IT IS FURTHER REQUESTED that, pursuant to 18 U.S.C. § 3103a(b) and Fed. R.

Crim. P. 41(f)(3), the Court authorize notice to be delayed for a period of thirty (30) days after

the termination of the monitoring period authorized by the warrant or any extensions thereof.


Phillip Lavoie
Special Agent
Homeland Security Investigations


OCT 2 3 2013

Sworn to before me this ____ day of October, 2013


HON. ROBERT B. COLLINGS
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS