UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                  )
UNITED STATES OF AMERICA   )
                                                  )
v.                                                )          No. 13-10289-DPW
                                                  )
JOSEPH CIMINO                         )
_____)

### DEFENDANT JOSEPH CIMINO'S SENTENCING MEMORANDUM

On April 30, 2015, defendant Joseph Cimino pled guilty, pursuant to a Rule 11(c)(1)(C) plea agreement, to a one-count superceding indictment charging him with conspiracy to commit money laundering. The plea agreement calculated Cimino's offense level as 27, Plea Agreement (Doc. 137) at 2, a calculation with which the PSR concurred.  PSR at 16.  The parties agreed that the reasonable and appropriate disposition of this case is a sentence of not less than 24 months and not more than 60 months. Cimino asks that the Court impose a sentence of 24 months.

The sentencing guidelines, as the Court is well aware, are advisory only, and must be considered in the context of a holistic assessment of all the 18 U.S.C. §3553(a) factors.  The Court is to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *United States v. Martin*, 520 F.3d 87, 91 (1st Cir. 2008), *quoting Gall v. United States*, 552 U.S. 38, 52 (2007). The offense as charged in this case depicts Cimino, then 26 years old, as a courier employed by uncharged third parties whose responsibility, according to the allegations in the indictment, was to receive and then deliver money on three occasions within a less than four month period in 2012. Since his arrest in November, 2013, Cimino, who has no criminal record, has ended his long-time dependence on marijuana, has earned a B.A. from Boston University, and has gained

maturity and accepted responsibility for his actions, as shown in letters quoted in this Memorandum and submitted to the Court.  These, and other §3553(a) factors, militate in favor of the imposition of a sentence of 24 months, which is sufficient, but not more than necessary, to serve the purposes of sentencing.  This is another case in which, as the Court recently said in *United States v. Fitzpatrick et al.*, No. 13-10308-DPW,  "*the fact of incarceration is as important as the length of it and need not be too severe.*"  https://www.bostonglobe. com/metro/ 2015/07/02/two-scheme-rig-chelsea- housing-inspections-sentenced-federal-court /Hf28DPbkoB0wfHLFCzVJtK/story.html (emphasis added)(last visited July 6, 2015).

USSG §2S1.1, the guideline to which Cimino is subject, is driven in substantial measure by the amount of funds laundered, here $567,670. Although that sum falls near the low-middle of the $400,000 to $1,000,000 range which adds 14 levels to Cimino's §2S1.1 offense level, it falls at the very bottom of the new inflation-adjusted guideline of $550,000 to $1,000,000 that has been proposed and is likely to become effective on November 1, 2015, a guideline which the government has agreed should be applicable to the sentencing of Cimino's codefendant Husain Yassin.

I      THE 18 U.S.C. §3553(a) FACTORS WARRANT THE IMPOSITION OF A SENTENCE OF 24 MONTHS.

A.      Cimino's History and Characteristics.

This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, 441 F.Supp.2d 506, 513 (S.D.N.Y. 2006), *aff'd* 327 Fed. Appx. 713 (2007). Cimino's personal history and characteristics militate in favor of a 24-month sentence.

Cimino is now a 29-year-old young man, the product of a highly dysfunctional family,

**[redacted]** Regrettably, but perhaps not surprisingly, Cimino turned to self-medication, using drugs – predominantly marijuana – and alcohol to help him cope with his ongoing depression and his painful stress and anxiety. Cimino does not recount his family history or past drug dependence here to suggest that the fault for his criminal conduct lies anywhere except entirely with him, but that history forms an integral and necessary part of the background of how he came to stand before the Court for sentencing.

Since his arrest, Cimino has worked hard to overcome his past, forsaking the use of alcohol and drugs and completing the B.A. degree which he interrupted his studies for to help his father with his businesses. He gained acceptance to both Boston University's and Suffolk University's MBA programs, which he understands he will be unable to attend as a consequence of the offense which he committed and for which he anticipates he will be incarcerated. Although unmarried, he has a significant and evolving relationship with a young woman, Lindsey Sulger, to whose care he has devoted himself through the aftermath of serious injuries she suffered in an automobile accident and who remains committed to and supportive of him. As the appended letters attest, Cimino is a caring and intelligent young man of tremendous potential to contribute to society and to the lives of those around him. He recognizes that he will be incarcerated for his offense conduct, and he accepts that consequence of his actions. He hopes, however, after his period of incarceration, to resume the remaking of his life along the positive lines he has begun. A 24-month sentence will permit him to do so, while at the same time adequately punishing the crime to which he has pled guilty.

**[redacted]** By the time he graduated from high school, Cimino was using marijuana on a daily basis, a usage that continued until his arrest in this case, and regularly drinking alcohol to excess. PSR at 23-24. Cimino  attended Boston University from 2005-09, but dropped out without

3

completing his degree studies and went to work for his father, who owned and managed real estate and owned two popular Boston restaurants, now closed. PSR at 25, 26.  During that time, Cimino was the manager of Daisy Buchanan's, being responsible for day-to-day operations, and was in charge of the oversight of the management at Ciao Bella, another restaurant owned by his father. Letter of Douglas Haley, submitted herewith as Exhibit B. *See* Letter of Joseph P. Cimino (Cimino's father), submitted herewith as Exhibit C (Cimino "stepped up for" him when he was physically and medically impaired and "handled the day to day business" and "worked tirelessly with [him] in 2009 to help [him] try to maintain the financing from the bank that had now withdrawn the construction loan," which involved "putting together voluminous amounts of paperwork and data"). **[redacted]**

Finally, in 2012, Cimino moved to Los Angeles. Cimino's marijuana and alcohol usage continued unabated. Cimino then became involved in the offense conduct to which he pled guilty, which, as alleged in the indictment, charged him with undertaking the role of a money courier in return for a fee, more specifically, that on three occasions between April and August, 2012, he received significant sums of currency totaling $567,670 from persons employed by the Canadian owners of the money and that he thereafter delivered the money as directed.[1]

Cimino's arrest in this case in November, 2013, has been a sobering and life-changing experience. Since his arrest, Cimino has abandoned the use of drugs and alcohol, although he still struggles with urges to smoke marijuana, such that he would benefit from participation in an RDAP program, for which probation believes him to be an appropriate candidate. PSR at 24.

Cimino moved back to Boston after his arrest and resumed seeing Dr. Madigan. During the

---

[1] None of the principals in that organization have been charged in either the United States or Canada.

time she has been treating him since his return to Boston, Dr. Madigan has observed that Cimino has

"changed and matured," a transformation which led to his completing his undergraduate degree at

Boston University and obtaining acceptance into two MBA programs. In her assessment,

> Joe recognizes his mistakes and very poor decisions. He takes full responsibility for his actions. However, he is anxious to make amends and move on with a productive life. He looks forward to the day when he can complete his education and begin to contribute meaningfully to society.

Letter of Anne Marie Madigan, M.D., Exhibit A. Also after he returned to Boston, Cimino re-

established relationships with his mother and father. Twice a week, as he had been doing when he

lived at home, Cimino helps his mother with doctor's appointments and grocery shopping. PSR at

20. He also takes his father – who recently had major orthopedic surgery – to medical appointments

and helps with grocery shopping and managing his father's business. *Id.* When his father's

properties, including Daisy Buchanan's, faced foreclosure in 2013-14 because of his ill health,

Cimino stepped in to work closely with his father's lawyers to bring about a successful sale and

restructuring. As Lewis A. Sassoon of Sassoon & Cymrot writes:

> In regard to working with this complicated restructure, Joseph M. really carried the ball. He took part in almost all negotiations. He helped do pro forma projects and got us information and documents for the restructure. He actually reviewed all the pleadings and documents in regard to the foreclosure proceeding. This process, because of its complexity, took a very large amount of time. Further he cared for his parents during this period of time. In closing, I would say that Joseph M. really showed himself to be an upstanding, bright articulate person who really helped in intricate business matters and assisted us in place of his father who [was] greatly incapacitated during this period of time.

Letter of Lewis A. Sassoon, submitted herewith as Exhibit E.

Cimino has also maintained his close relationship with Ms. Sulger, whom he met in 2010.

*See* PSR at 20. He very much hopes that their relationship will survive his imprisonment and that

they will marry after his release. Ms. Sulger's father Michael Osterman has written feelingly to the

Court about the love and care which Cimino showed for Ms. Sulger during her long medical ordeal following a serious automobile accident. Since Cimino's arrest, Mr. Osterman has had "many very personal, truthful, and painful conversations with" Cimino, who has "admitted to [him], with shame and remorse, what transpired and that he is accepting all accountability and responsibility for his actions." Letter of Michael Osterman, submitted herewith as Exhibit F. In his estimation, the manner in which Cimino has conducted himself since his arrest has been "mature, forthright, and responsible." *Id*. Mr. Osterman has come to love Cimino like a son and "couldn't ask, hope, or imagine finding, a better life partner for [his] daughter." *Id.*

Ms. Sulger's mother Lonnie Osterman also describes the love and care which Cimino showed not just to Ms. Sulger but to their entire family:

> My daughter Lindsey introduced me to Joey in August 2012. I was immediately impressed with his respectful, intelligent, sincere, and dignified demeanor. He proved to be the real thing. While my daughter and I both struggled with life altering spinal injuries and subsequent surgeries, Joey helped in every way imaginable. There are few young men that contribute to others without thought of personal gain as Joey did so naturally. Rather than just enjoying Lindsey's company on dates, he stayed at her hospital bedside around the clock after surgery. He took active responsibility as her advocate, supporting her medical care and treatment. His humor brought much needed relief by way of sore belly laughs. At the same time, he provided my family and I with much needed rest. While Lindsey was recovering at home, Joey jumped in willingly to accomplish anything necessary: from preparing meals, to bandage changes, and pet care. Always with a smile, he was sincerely present, positive, and giving of himself, not just to Lindsey, but to my entire family. Family, I came to learn was his first priority.

Letter of Lonnie Osterman, submitted herewith as Exhibit G. She also noted that after his arrest, Cimino "chose to be forthcoming and honest with our family," "espress[ing] his sincere remorse, as well as his intention to take responsibility for his mistakes." *Id.*

Ms. Sulger herself describes the love, care, and attention which Cimino has shown her during her long and painful recovery from the injuries which she suffered in the accident when, instead of

abandoning their fledgling relationship, Cimino devoted himself to her care:

> In October 2012, I underwent my first major spine surgery that resulted in significant complications both during and after the procedure. Joey insisted upon staying at my side for most of my lengthy hospital stay, sometimes holding me in my hospital bed as I suffered through horrendous pain. His physical and emotional presence did not end there. Joey became one of the most reliable, comforting, compassionate sources of support for me during my lengthy recovery period. When I could not put on my own socks and shoes, he was there to put them on my feet. He held my hand and looked out for my physical wellbeing as we took countless walks together for the benefit of my own physical recovery. I became stronger but never fully recovered from the first surgery due to a number of unforeseen complications. Joey was right there with me when I received some bad news, he provided emotional support, encouragement, and later he actively pursued new medical care options for me. He located and brought me to a second surgical opinion with one of the most reputable spine surgeons at Brigham and Women's Hospital as well as a pain management specialist from Harvard University. I underwent a second surgery and surgical revision in March 2015. This surgery came with greater risks and I had fewer people to count on for support. Despite Joey's complicated situation in his own life, he made every effort to be present for me during a very difficult, scary time in my life when I had very little support. Joey remains the strongest source of support for me and for my family members during these two difficult surgeries. It was his presence, and active support that got me through some of the worst days. I could not have made it through these two surgeries without Joey's constant support, compassion, patience, and physical care. He stepped in to take care of me during times when my family could not.

Letter of Lindsey Sulger, submitted herewith as Exhibit H.

Cimino's willingness to help others was not confined to Ms. Sulger. His friend Phillip Moss writes feelingly of the invaluable help which Cimino gave him after he was diagnosed with depression:

> I was diagnosed with severe depression. My relationships with friends and family quickly deteriorated, and I moved back to Los Angeles. I knew that Joe was in California, so I reached out to him hoping to rekindle our college friendship. Right away he could tell that I was off center and encouraged me to seek professional help. I rejected his advice; I had abandoned all hope in living a happy or fulfilling life. But, Joe was not deterred. When my family and friends had given up on me, Joe was there for me. He continued to encourage me to seek professional psychological counseling assuring me time and again that "life is worth living, even if you can't see that right now."
> Throughout the depths of my depression, I was convinced beyond all hope that 'life has no intrinsic meaning or value.' During that time Joe and I spent many nights together

discussing 'the meaning of life.' In his unique way, filled with compassion and empathy, he sat with me, he cared for me, and bestowed onto me the type of knowledge that only a true friend could. What he said has stayed with me for life. To put it without hyperbole – what he said, saved my life. He exposed me to what it meant to be human. That people are more than biological creatures, we are beings capable of autonomy and fulfillment, that "the purpose of life is to have a purpose."

Since those late night conversations with Joe, I am no longer embarrassed to ask for help when I need it. I am on a path that has meaning for me, and am currently exploring graduate school opportunities in my chosen field. I can say with an open heart that these opportunities would not have materialized without a friend such as Joe. Joe's hopefulness, strength, optimism, and persistence in being a genuine companion has had an immeasurable positive impact on my life.

Letter of Phillip Moss, submitted herewith as Exhibit I.

Cimino's care for others is also evidenced in his friendship with Ryan Galvin, who describes the invaluable support which Cimino gave him when his mother was diagnosed with cancer:

Joe is the definition of a great friend and the epitome of "the shirt off his back" type of guy. He has been there with me through thick and thin, every thing from the tragic passing of my aunt, whom I was very close with, to my mother's cancer diagnosis. I remember when my mother was diagnosed with cancer just like it was yesterday. I was supposed to pick her up from a routine procedure and was told it would only be a couple of hours. The hours went by and I was not hearing from anyone. Finally hours after I was supposed to pick her up I received a phone call. The call was to tell me that I was not picking her up because they had found an extremely large tumor and my mother couldn't leave the hospital because she needed to go into emergency surgery as soon as possible. I was absolutely devastated by the news and I had no one there for me. My fiancee was at work and she couldn't be there and I didn't want to bother her at work with such bad news. I called Joe and told him about the whole situation and he couldn't have been there any faster for me. He immediately came out to my apartment and was there to help me through the rest of the day. He was my shoulder to cry on and did everything he could to keep me positive and keep me distracted from myself. I will never forget that day for as long as I live and will forever remember that he was the one that was there for me in a second no questions asked.

Letter of Ryan Galvin, submitted herewith as Exhibit J. Galvin has observed that, since his arrest, Cimino "has changed a lot for the better," *id.*, "dedicat[ing] himself to improving" and "bettering himself for when he gets out." Letter of Jessica Smolinsky, submitted herewith as Exhibit K. Both Galvin and his wife Jessica Smolinsky confirm Cimino's continued abstinence from marijuana and

alcohol. *Id.*

Another friend writes of the help and support which Cimino provided after his mother was diagnosed with terminal cancer:

> The most prominent example which truly exemplifies Joe's loyalty and generosity is from about six years ago. My mother was diagnosed with terminal cancer, and we as a family decided to host a benefit for her to help with missed work and medical expenses. It turned out to be a huge success and one of the biggest reasons for that success was Joe. The energy he brought to the benefit coupled with his altruistic tendencies all but guaranteed that the night would be a triumph. . . . What stands out most in my memory is Joe, a young man in his early 20s, doing what he could to help a woman that he had never met. The generosity he showed that night was far beyond the expectation of his age and experience.

Letter of Donald Reardon, submitted herewith as Exhibit L.

In fashioning the sentence to be imposed in this case, this Court can certainly consider Cimino's recent efforts to change his life, including his remorsefulness, his sobriety, his hard work at learning the skills required to start an e-commerce business (which because of a lack of inventory has not yet gotten off the ground), his loyalty to Ms. Sulger, his caretaking efforts with his parents, and his mature acceptance that his actions have consequences and that he very likely will be incarcerated as the result of his participation in the money laundering conspiracy to which he has pled guilty.

### B.    The Nature and Circumstance of the Offense.

The offense conduct to which Cimino pled guilty consisted of picking up cash from one individual and passing it on to another on three occasions. Cimino has acknowledged, and deeply feels, the wrongfulness of his conduct, which took place during a period when he was regularly anesthetizing himself with marijuana and alcohol, and has not contested his guilt of money

laundering or his knowledge that the funds he transferred were derived from marijuana sales.[2] Money laundering, as the Court is well aware, can take many forms, from the highly sophisticated, involving complicated banking transactions, phony corporations, and offshore accounts, to the very simple, such as transfers of cash from one person to another. Cimino's charged offense conduct was far closer to the latter end of the spectrum than the former. He was neither a sophisticated money launderer, nor was he in the business of money laundering. Instead, he was charged with acting as a courier, albeit a courier in a much larger organization, called upon as needed to meet someone in California, pick up cash, and deliver it to another person. So unsophisticated was Cimino's charged conduct that he used a rental car rented in his own name to drive to and from one of the meetings. *See* PSR at 7.

In fiscal year 2014, the mean sentence in the First Circuit for money laundering was 36 months, and the median sentence was 28 months. United States Sentencing Commission, *Statistical Information Packet, Fiscal Year 2104, First Circuit*, Table 7. This data no doubt includes defendants who laundered much more money than that with which Cimino was involved and in more sophisticated ways, and includes defendants who were in the business of money laundering, as well as defendants who owned the money being laundered, all of which would tend to skew the sentencing statistics upward. Cimino's offense conduct and his role as a courier warrant a sentence below the median, underscoring the appropriateness of a 24-month sentence.

**C.    The Seriousness of the Offense, Promoting Respect for the Law, Providing Just Punishment for the Offense, Affording Adequate Deterrence to Criminal Conduct, and Protecting the Public from Further Crimes by Cimino.**

---

[2] The evidence shows that Cimino did not respond to "Amigo's" need for couriers in the fall of 2012 – Amigo's "big season," PSR at 11 – and Cimino was not involved in the events leading up to the seizure of methamphetamines described in paragraphs 46-54 of the PSR.

Under §3553(a), the Court must also consider the purposes of sentencing, which are: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes by the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." §3553(a)(2). Critically, §3553(a) mandates that the Court impose a sentence "sufficient, *but not greater than necessary*, to comply" with these purposes (emphasis added). Cimino has agreed that a period of incarceration is necessary to reflect the seriousness of the offense, but "just punishment" for Cimino – as well as the sentence sufficient to serve these sentencing goals – is a sentence of 24 months.

Respect for the law would be promoted by the individualization of the sentence imposed upon Cimino to take account of his history and the way in which he turned his life around following his arrest. Many defendants stand before the Court for sentencing and avow their intentions to turn their lives around if given a second chance. In the past year, Cimino has actually done so. He has given up the drugs and alcohol which in part led him into the offense conduct for which he is before the Court and which severely handicapped his ability to address his life-long mental health issues. He has resumed treatment with a psychiatrist. He has obtained his bachelor's degree. He has planted the seeds for actualizing an e-commerce business when his incarceration ends.  He has also laid the groundwork for obtaining an MBA after his release. He has worked very hard to overcome his family history and its disastrous effects on him and to deal with his problems in a mature and systematic way and will continue to do so. A 24-month sentence would generate respect for the law by demonstrating that it can be both reasonable and just.

11

Cimino's conduct in the past year demonstrates his commitment to changing his life and leading a productive and drug-free existence, which is in itself a reliable indicator that the public is not in danger of further crimes by Cimino. Sentencing Commission recidivism statistics bear out the low danger of recidivism for defendants like Cimino, with zero criminal history points. Men between 26-30 years old at the time of sentencing who are in CHC I have only a 13.3% recidivism rate, USSC, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, Ex. 9 (May 2004), available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf (last visited July 8, 2015). *See, e.g., United States v. Germosen*, 473 F.Supp.2d 221, 227 (D.Mass. 2007)("Minimal or no prior involvement with the criminal justice system is a powerful predictor of a reduced likelihood of recidivism"); *United States v. Cabrera*, 567 F.Supp.2d 271, 279 (D.Mass. 2008)(considering the fact that defendants "with zero criminal history points are less likely to recidivate than all other offenders"). Defendants with college degrees, which Cimino now has, have only an 8.8% recidivism rate. *Id.* at 12. Moreover, under the disposition to which the parties have agreed, Cimino will be subject to supervised release for three years after his release, which provides an additional guarantor that he will not engage in future criminal activities.

As for both specific and general deterrence, research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in the severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id.*; *see also* Zvi D.

Gabbay, *Exploring the Limits of the Restorative Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol., 421, 447-48 (2007)("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity"); The Sentencing Project, *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment* at 4 (2010)("Criminological research over several decades and in various nations generally concludes that enhancing the certainty of punishment produces a stronger deterrent effect than increasing the severity of punishment"), available at http://www.sentencingproject.org/doc/Deterrence%20Briefing%20.pdf (last visited July 8, 2015). A sentence at the low end of the agreed-upon range would also recognize that Cimino had no leadership role in the charged money laundering activities and that, in contrast with Cimino, the leaders of the organization remain uncharged three years later.

## CONCLUSION

Cimino has acknowledged the grave mistake he made in becoming involved in the offense conduct that brings him before the Court for sentencing and has worked hard to turn his life around and eliminate the influences which contributed to his decision to knowingly violate the law. This Court should fashion a sentence which will permit Cimino, at the earliest possible time, to remake his life and make the contributions to society, and the individuals in it, of which he is capable. Cimino urges the Court to impose a sentence of  24 months, followed by three years of supervised release, which will both adequately serve the purposes of sentencing and allow him to resume rebuilding his life and making the positive contributions to society and those around him of which he is capable and which he wants nothing more than a chance to be able to do.

Respectfully submitted,
By his attorney,

**/s/ Martin G. Weinberg**
Martin G. Weinberg
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700 (telephone)
(617) 338-9538 (fax)
owlmgw@att.net

## CERTIFICATE OF SERVICE

I, Martin G. Weinberg, hereby certify that on this 21st day of July, 2015, I caused the within Sentencing Memorandum to be served on all registered participants through its filing with this Court's CM/ECF system.

**/s/ Martin G. Weinberg**
Martin. G. Weinberg